[Crim. No. 1722. Third Appellate District.—July 19, 1940.]

THE PEOPLE, Plaintiff and Appellant, v. MERLE BUSBY, Defendant and Appellant.

Leo R. Friedman and Ernest Spagnoli for Defendant and Appellant.

Earl Warren, Attorney-General, and J. Q. Brown, Deputy Attorney-General, for Plaintiff and Appellant.

HAWKINS, J., *pro tem.*—Appellant, Merle Busby, Sally Stanford and Dorothy Heber were jointly accused under an amended indictment containing four counts, the first count charging a violation of section 278 of the Penal Code (child stealing), the second count a violation of section 267 of the Penal Code (abduction), the third count conspiracy to commit child stealing, and the fourth count conspiracy to commit abduction.

All defendants entered pleas of not guilty to all counts and appellant Busby entered an additional plea to all counts of not guilty by reason of insanity.

Defendants Stanford and Heber were granted separate trials.

At the trial of appellant Busby, before a jury, on the substantive charges, verdicts were returned finding him guilty on counts I and II and not guilty on counts III and IV. The same jury found that appellant Busby was sane at the time of the commission of the offenses charged in counts I and II. Appellant Busby's motion for a new trial was denied as to count I and granted as to count II.

Busby appeals from the judgment following the jury's verdict on count I and from the order denying his motion for a new trial.

Subsequently the state appealed from the order granting a new trial as to count II.

While there are actually two appeals to be considered, the word "appellant", for purposes of convenience, will be used hereafter only to designate the appellant Merle Busby.

The following facts are undisputed:

The girl here involved, hereinafter referred to as Evelyn, without the knowledge or consent of her parents, left Livingston, California, on September 13, 1939, with appellant, accompanied him to San Francisco and later to Oregon, where both were arrested by officers approximately ten days after they left Livingston.

Prior thereto Evelyn lived in Livingston with her parents. She had an aunt named Pauline Andrews and an uncle, Secondo Forgnone, who lived on his ranch about four miles from Livingston.

Appellant had a sister, Sally Stanford, who lived in San Francisco, where the People claim she operated a house of prostitution. With her lived Dorothy Heber.

Prior to the commission of the alleged offenses, Secondo Forgnone had met Dorothy Heber through a "lonesome club". After meeting Forgnone, Dorothy spent some time on his ranch at different times, helping him with the housework and preserving fruit. She induced Forgnone to give appellant a job on the ranch, where he received his room and board, but little, if any, money.

Appellant was twenty-eight years old. Evelyn was fourteen at the time the offenses were alleged to have been committed.

Secondo Forgnone also visited Dorothy in San Francisco and there met Sally Stanford. Both Dorothy Heber and appellant became more or less acquainted with the family of the girl before her disappearance.

Evelyn testified:

That she first met appellant, known to her as Merle Desmond, on her uncle Forgnone's ranch in August, 1939; that appellant wanted to put her in a girls' school at Belmont, California; he said his sister Sally would take care of her and that she would have a car and a pony later; that on September 13, 1939, appellant borrowed a car, met her on a country road, drove to a secluded spot and unsuccessfully attempted to attack her sexually.

She further testified that he induced her to meet him later the same day at a stage depot; that she did so, leaving a note to her parents, saying she would be back later. He induced her to take a Greyhound bus to Delhi, near Merced, and he followed on a Santa Fe bus, picked her up at Delhi, bought

her ticket and took her to San Francisco. From the depot at San Francisco they walked by a place which he said was one of Sally's places. It had pictures in front which he said were to disguise it. He said he wanted to see Sally. He left her at a refreshment stand and was gone about fifteen minutes. When he came back he said Sally had received two telephone calls from Livingston and they couldn't go to any of Sally's places. They remained in San Francisco five nights, sleeping together in different hotels and apartments. One day, after he had left her alone for some time, he said he had phoned Sally, who told him Evelyn's father had telephoned and that if they caught her they were going to put her in a detention home, and that he was not going to telephone Sally any more because her line was tapped, but that if they became separated or he was arrested he told Evelyn to telephone Sally.

On September 18th he borrowed a car and told her they were going to Oregon, and that he would put her in a school there. They traveled about a day and a half, sleeping in the car; they ran out of gas at Cave's Junction, Oregon, and stayed overnight in a cabin at a camp ground. He left the car in a garage and they walked on for six days, sleeping together overnight at various places. Toward the last he called on some people he knew, but read in a newspaper about their disappearance and that Sally was in jail. He then said they should go to Mexico, where he would marry a rich woman he knew and he could pass her off as his daughter. Evelyn stated she was afraid that if she returned to California she would be put in a detention home, so she agreed to go to Mexico with him.

The last night in Oregon they camped in the woods, when the officers arrested them and took them back to Merced.

Pauline Andrews, the aunt of Evelyn, and an Emma Thompson testified that they went to San Francisco at the suggestion of Dorothy Heber, who said that perhaps Evelyn was in love with appellant and it might be better to let him marry her. On September 18th they went twice to the Stanford place in San Francisco and talked with both Sally Stanford and Dorothy Heber. They were first told that they should not have come there, that they should know what kind of a place it was. On their second visit they were admitted after ringing the bell three times as directed by

Dorothy Heber. They were told by Sally and Dorothy that officers had been all over the place, that Sally had been looking for appellant and Evelyn, that appellant was no good, had been in scrapes before and had cost Sally a lot of money, that he would show up when he was broke, that Sally had been caused plenty of trouble by his escapades and it had already cost her five thousand dollars, that Evelyn couldn't marry him as he was already married, that Sally was running a high-class house of prostitution and that she wouldn't have Evelyn in her place. They were also told by Dorothy Heber that they would have to stay there several days, that they were locked in and she had the key, but they "sort of forced their way" out, and eventually went back to their hotel.

Officers Jerry Desmond and M. M. Morse testified that they called at the Sally Stanford house on September 14th, and were told by Sally she did not know where Evelyn or her brother was, but that appellant had been there about two days previously and had borrowed ten dollars, which he said he needed to buy a uniform so he could take a job in Modesto, that he was infatuated with a little sixteen-year-old girl in Livingston and Sally understood he wanted to marry her, that her brother came again on September 13th and borrowed two dollars and that he never brought any girl to her place.

On his appeal from the substantive charges appellant contends:

(1) That the court erred in admitting in evidence the testimony of Pauline Andrews and Emma Thompson.

(2) That the court erred in admitting the testimony of witnesses Desmond and Morse.

(3) That the court erred in admitting evidence as to the character of the Sally Stanford premises in San Francisco.

(4) That the prosecuting attorney was guilty of prejudicial misconduct in his argument to the jury.

 Within the limitations hereinafter expressed, the first contention is sound. Respondent claims that this testimony was admissible as consisting of acts and declarations of co-conspirators. But before acts and declarations of a co-conspirator, made out of the presence of the defendant, can be admitted in evidence, the existence of the conspiracy must first be proved by independent evidence. Furthermore, the acts and declarations must be in aid and furtherance of the common purposes or design of the conspiracy. (*People* v. *Linde,* 131 Cal. App. 12 [20 Pac. (2d) 704]; *People* v. *Lor-*

*raine,* 90 Cal. App. 317 [265 Pac. 893].) Timely objection to the introduction of this evidence, as well as the testimony of witnesses Desmond and Morse, was made by counsel for appellant.

█ The People assert that at least a *prima facie* case of conspiracy was established by circumstantial evidence, by proving certain isolated facts, such as the placing of appellant upon the Forgnone ranch, the flight of appellant and Evelyn to San Francisco, the character of the premises operated by Sally, and the fact that appellant did visit Sally in San Francisco, and no doubt intended to take Evelyn there, temporarily at least, if his sister would permit it. But the sum total of the facts and circumstances revealed by the evidence is insufficient to produce, at most, more than a mere suspicion of guilt on the conspiracy charges.

A *prima facie* case of conspiracy was not established and the bulk of the testimony of these witnesses was improperly admitted.

For identical reasons the second contention of appellant must be sustained so far as the acts and declarations of the alleged co-conspirators are concerned.

█ Appellant's third contention is that reputation evidence was admitted erroneously to prove that the Stanford apartment was a house of prostitution, claiming that such evidence is only admissible in prosecutions under the provisions of section 315 of the Penal Code. The weight of authority is to the contrary. (9 Cal. Jur. 574; *Demartini* v. *Anderson,* 127 Cal. 33 [59 Pac. 207].) This evidence was admissible in an attempt to prove defendant guilty of the charge laid in count II, to wit: Abduction for the purpose of prostitution.

█ Appellant complains that the admission of all of the foregoing testimony was exceedingly harmful to him and that it constitutes reversible error. He urges that the story told by Evelyn is so fantastic and improbable that the jury might not have believed it had they not been prejudiced by some of the facts brought out by said testimony, and in particular, the following facts: That Busby was no good, that he had been in trouble before and had cost his sister a lot of money, and that his sister, Sally, was, in fact, the keeper of a house of prostitution. There is no merit in this contention. The girl's testimony shows a few minor discrepancies, such as

usually mark the honest witness, but through its long, rambling maze it carries conviction.

Furthermore, it is corroborated in many important particulars: By the testimony of the ticket sellers who sold the tickets on the bus, by the testimony of one James Di Bartolo, who saw appellant take the Santa Fe bus on September 13th and to whom appellant stated that he was going to San Francisco and that if Forgnone or any of the family asked for him to say he had not seen him; by the testimony of the stage driver who drove the runaways to San Francisco; by the testimony of the hotel clerk in a San Francisco hotel that a couple answering their description stayed there the night of September 13th; by the testimony of the man from whom appellant borrowed the car for the Oregon trip, on a pretext of temporary use; by the testimony of two witnesses at Cave's Junction, Oregon, both of whom saw appellant with a girl there on September 19th, and one of whom heard her asking to be returned to California while appellant wanted to take her to Mexico; by the testimony of Sheriff Cornell of Merced County as to appellant's admission of having taken Evelyn to the particular hotel in San Francisco, and by expert testimony as to the condition of the linen in the cabin at Cave's Junction, Oregon, and medical testimony as to the condition of the girl.

The jury also had the right to consider the significance of the fact that appellant Busby never took the stand in his own defense.

The jury having acquitted on counts III and IV and the trial judge having granted a new trial as to count II, the evidence erroneously admitted must be considered only in the light of its application to count I.

In a close case there is little doubt that the admission of this evidence might be held to be reversible error, but in the instant case the evidence as to count I is so uncontradicted and so overwhelming that if appellant had been pictured by the evidence as a paragon of virtue, the jury could have reached no other verdict. The admission of this evidence has not resulted in any miscarriage of justice and was not reversible error. (Cal. Const., art. VI, sec. 4½.)

There is no merit in appellant's fourth contention. The remarks of the prosecuting attorney which were assigned as misconduct are as follows: ''This is something I hate to

have to say; it is a regrettable situation, but it is true, and experience has shown it, and there isn't an experienced law enforcement officer in the state of California, the United States, or in the world, or any place, who doesn't recognize the fact, and it is a fact, that young girls of this age are taken for a special and specific clientele. It is regrettable, but they pay money for it and it is an actual fact.''

Counsel for appellant assigned the remarks as misconduct, asked the court to instruct the jury to disregard them and to declare a mistrial; whereupon the court ruled as follows: ''The request to declare a mistrial will be denied. The record may show the assignment of error and the court will again instruct the jury not to accept any facts from the argument of counsel and if he states any facts that witnesses have not testified to, you are to form your opinion from the testimony produced here.''

The remarks may be classed as rhetorical embellishment which overstepped the bounds of propriety, but considered in connection with the remarks of the trial judge and limiting their application to the offense as charged in count I, they may not be regarded as prejudicial misconduct.

Appellant further makes the following contentions:

(1) The court erred in commending the jury on finding defendant guilty of the substantive charge.

(2) The court erred in its instructions as to the burden of proving insanity.

The language of the court complained of in the first contention is as follows:

''I usually thank every jury, but I want to particularly thank you because this was a very difficult case to try. There were many features of it particularly disagreeable and I really do appreciate your assistance in the matter and the intelligence shown by the jury is of a very high order and I appreciate that, also.''

These remarks were made by the trial judge at the conclusion of the trial on the substantive charges and before the trial of the insanity issue. The court then ordered the jury to come back on the following Thursday and the following colloquy ensued:

''A Juror: Do we have to come back again?

''The Court: Yes, but the issue will be more pleasant to try. It is simply the question of not guilty by reason of insanity. You are discharged—excused, rather, until Thurs-

day morning at 10:00 o'clock. It is a long while to Christmas, you will have days to shop.''

Appellant contends that the language of the court expressed approval of the jury's verdict and had a tendency to minimize the importance of the insanity issue. As authority they cited *People* v. *Pokrajac,* 206 Cal. 259 [274 Pac. 63], where somewhat similar comment made by the trial judge was held to be reversible error.

Our legislature has seen fit to provide for separate trials on substantive charges and the issue of insanity. In so doing it must be assumed that it believed that our juries would have sufficient intelligence to know which issue they were trying. In an ordinary case, to say that a trial judge's comment that the jury's verdict on the substantive charge was ''intelligent'' would be understood by the jury to mean that the judge thought the defendant was sane, is to ascribe to the jury a lack of ability to understand the issues or to follow the instructions of the court. It is only in a case where the evidence on the issue of insanity is exceedingly close and a miscarriage of justice has occurred that such a comment could be held to be reversible error. *People* v. *Pokrajac, supra,* is just that kind of case. There the death penalty had been made mandatory by the verdict of the jury before it had had opportunity to hear testimony as to the mental condition of the defendant. The evidence on the insanity issue was conflicting and the facts and circumstances surrounding the commission of the offense were such as to make it appear probable that the defendant was insane at the time.

In the instant case appellant's own expert witness refused to pronounce him either medically or legally insane. The two cases can be distinguished in other essential particulars.

Furthermore, since the Pokrajac case was reported, the amendment to the California Constitution, permitting the trial judge to comment upon the evidence, has gone into effect. (Cal. Const., art. VI, sec. 19.) It has been held that this right of comment even permits a trial judge, in proper cases, to express an opinion as to the guilt of the defendant. (*People* v. *Ottey,* 5 Cal. (2d) 714 [56 Pac. (2d) 193].)

The fact that the trial judge's remarks were made before the trial on the insanity issue rather than during its progress, gives rise to no distinction as the trial on the substantive charges and the insanity issue constitute but a single trial. (*People* v. *Troche,* 206 Cal. 35 [273 Pac. 767].)

The jurors were fully and correctly instructed as to the effect that they were the sole and exclusive judges of the effect and value of evidence and of the credibility of witnesses. The remarks of the trial judge did not constitute reversible error.

■ The second contention of appellant in reference to the insanity issue is not tenable.

The instructions complained of were given at the People's request and read as follows:

"In this case the defendant Merle Busby is presumed to be sane. This presumption may be overcome by evidence to the contrary, the burden of proof being on defendant. In other matters the accused has only the burden of raising a reasonable doubt in the minds of the jurors. If, in this case, the presumption of sanity has not been overcome by a preponderance of all the evidence, it is your duty to find the defendant to have been sane on said date."

"The court instructs the jury that you are not to consider whether or not the defendant is insane at the present time, but you are to consider him as now sane; a person charged with a crime cannot be legally tried for such crime unless he be sane at the time of the trial. The defendant has presented the issue to you that at the very time of the alleged commission of the offenses, he was insane. The burden of proving his insanity at that time rests upon him, because the law presumes he was then sane."

Appellant claims that the trial court committed reversible error in instructing the jury that the burden of proof was on the defendant to establish his insanity and in support of his position he cites *People* v. *Hickman,* 204 Cal. 470, at 477 [268 Pac. 909, 270 Pac. 1117].

It is true, as urged by appellant, that the burden of proving sanity is on the prosecution, but that burden "is met in the first instance by the presumption of sanity which the law raises and which must prevail until it is overcome. The rule relating to the defense of insanity does not shift the burden of proof from the People to the defendant, but only shifts the burden of introducing evidence and declares the amount or *quantum* of evidence which he must produce to overcome the presumption and show his insanity." (*People* v. *Hickman, supra.*) The court also gave an instruction in conformity with the law as stated in *People* v. *Hickman, supra.*

The question is highly academic and "is of little practical importance so long as the defendant's plea must be established by a preponderance of all the evidence". (*People* v. *Bradshaw*, 5 Cal. App. (2d) 528 [43 Pac. (2d) 317].) It is unreasonable to assume that the giving of this instruction misled the jury to the prejudice of defendant.

██ Little need be said in reference to the appeal of the People from the order granting a new trial as to count II. There is very little substantial evidence in the record to support the jury's verdict. The discretion of the trial court to grant a new trial is very broad and will not be disturbed by a reviewing court except for an abuse of discretion. (*People* v. *Canfield*, 173 Cal. 309 [156 Pac. 1046] ; *People* v. *Cesana*, 18 Cal. App. (2d) 727 [64 Pac. (2d) 732].)

The action of the trial court in granting the motion for a new trial was proper.

The judgment and the orders appealed from are affirmed.

Pullen, P. J., and Tuttle, J., concurred.