## Commonwealth *v.* Romano, Appellant.

Argued April 23, 1958. Before JONES, C. J., BELL, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*James Thomas McDermott,* with him *McDermott, Quinn, & Higgins,* for appellant.

*James McGirr Kelly,* Assistant District Attorney, with him *Juanita Kidd Stout,* Assistant District Attorney, *James N. Lafferty,* First Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for appellee.

OPINION BY MR. JUSTICE ARNOLD, May 26, 1958:

Defendant was charged with the killing of Albert Foglietta in his restaurant-tavern at 6th and Bainbridge Street in Philadelphia, in the course of a robbery. He was indicted and convicted of murder in the first degree, and now appeals from the judgment and sentence of life imprisonment.

We have read and examined the entire record, but we set forth herein only such facts as are necessary to a full and fair consideration of the questions raised on this appeal. The decedent, Foglietta, owned and operated a tavern at the corner of 6th and Bainbridge Streets in the city of Philadelphia. He had closed his place of business at approximately 2:00 A.M., April 14th, and proceeded to tally his day's receipts. As he was doing so, his part-time employe, Salvatore Caputo, was eating a light lunch—both men being behind the bar. At about 2:30 A.M., a knock came to the curtained door, and a voice requested that decedent open the door, declaring also: "This is 'Nick'; this is 'Tony.' " The deceased having stated that the place was closed, the party apparently left. Approximately 10 to 15 minutes later, there was another knock and the same voice requested entrance. Deceased then went from the bar to the door, and upon opening it was met by the defendant who was masked with a handkerchief. With drawn pistol defendant forced the deceased back to the cash register, which was to the left of Caputo, and ordered deceased to give him the money. At this point the deceased handed the money to Caputo, and defendant shot the deceased. As he did so, the mask slipped from defendant's face, thus giving Caputo a full view of him.

Caputo then ran into the kitchen adjoining the bar, threw the money onto a shelf, retreated to the basement. He heard another shot, and then steps across the floor. Having determined that the gunman had departed, Caputo returned to the bar and found the deceased lying on the floor, with blood over part of the area. He also found a bloodstained dollar bill.

The police were called, and Caputo proceeded to give a description of the murderer, which proved to tally with the features of this defendant. On the same

day he pointed out defendant's police picture as being that of the killer. At about midnight of that day, defendant and his brother, having similar builds and features, were taken to Caputo for purposes of identification, and Caputo again pointed to the defendant as the killer.

A second bloodstained dollar bill was found, on the day of the killing, lying in Marshall Street, which was one of two alternative routes one would take to go from the tavern to defendant's home, several blocks away.

Aside from Caputo's testimony, which unequivocally identified defendant as the killer, the remaining evidence against defendant was in the nature of circumstantial evidence. The murder weapon was never found. Defendant's defense was an alibi: that he was at his home, in bed, at the time of the crime. This he attempted to establish by his own testimony, as well as that of his wife, a neighbor, and one Forte, a young man who declared that he saw defendant enter his home at about 2:00 A.M. and did not see him leave.

In the course of his charge, while commenting on the testimony of Forte, the trial judge declared: "And he [Forte] said that he was there [50 feet from the entrance to defendant's home] at about 1:20 in the morning, and after he was there a half hour or three-quarters of an hour, which would take it to a quarter of 2:00 or maybe 2:00 o'clock at the latest, . . . the defendant walked past and he walked toward his home . . . right near Marshall street was the defendant's home. And this young man says he stayed there . . . for one hour to an hour and a half after the defendant passed him and he didn't see the defendant come out of his home while he was there, and he said he stayed there until 3:00 o'clock when the police began to arrive." This was a fair summation of his testimony;

but defendant complains that the trial judge committed basic and fundamental error in following this with: "Now, if you believe that testimony, that he didn't come out of the home, that is proper evidence for you to believe, if you rely on it, and from which you can draw an inference that this defendant, in fact, went in his home not later than 2 o'clock, . . . and didn't come out again—at least, not out the front door. It was said there was no evidence that there was another door there. There may or may not be, that is all for you to draw, whether there is a back door or any other way he could have gotten out . . . It is the believability of Forte's evidence that you have to rely upon and determine . . ."

It is to be noted that during his examination Forte was asked by the Court: "Q. Where were you standing? A. Directly from his house, 50 feet away. Q. You would see him leave the front door? A. Yes. Q. You didn't have the vision of the back door or any other part of the house, did you? A. No."

No objections were raised, nor was there any attempt to meet the inferences which could be drawn from his testimony. In addition, throughout his charge, the trial judge fully and fairly instructed the jury as to the duty resting upon it to determine the facts, draw its own inferences from the testimony, and to determine the credibility of witnesses and the testimony. To say that a trial judge cannot comment upon the evidence runs contrary to our established law. So long as he does not direct the jury what to find as a fact, he may even declare his own opinion as to the guilt or innocence of the defendant. "It is the exclusive province of the jury, not the court, to decide all the facts, the inferences therefrom, the credibility of the witnesses and the weight and effect to be given to all of the testimony. While the main purpose of a

judge is to state and explain the law and briefly review the evidence, it is always the privilege and sometimes the duty of a trial judge to express his own opinion, including his opinion of the weight and effect of the evidence or its points of strength and weakness or even the guilt or innocence of the defendant and the verdict which, in his judgment, the jury should render, provided (1) there is reasonable ground for any statement he may make; and (2) he clearly leaves to the jury the right to decide all the facts and every question involved in the case regardless of any opinion of the court thereon.": *Commonwealth v. Chambers*, 367 Pa. 159, 164, 79 A. 2d 201. The trial judge satisfied every detail of the foregoing rule, and was fully within his rights to suggest such matters in aid of the jury's determination of the effect to be given to the evidence.

Defendant also contends that the verdict was against the weight of the evidence. His contention in this regard is solely that the Commonwealth's evidence should not have been believed by the jury. His argument on this point is one that should have been directed to the jury, upon whom rested the duty of determining credibility of the witnesses. They decided against him upon testimony they could reasonably and legitimately believe.

Defendant next attacks the court's refusal to permit further cross-examination of one of the police officers who had testified as to the bloodstained bill and bloodstained clothing of defendant. The officer had undergone direct examination and cross-examination. He was then called on redirect examination, and, in a discussion with the court, defendant declared that he would limit his recross-examination to the points raised on redirect. However, he proceeded further to cross-examine the officer and was prevented from so doing by the court. A reading of the record abundantly discloses

that defendant had been given free rein in cross-examination, not having been hindered in any fashion by the court. Cross-examination is a matter of right, but the bounds of proper cross-examination are necessarily within the sound discretion of the trial judge, and this is particularly so when applied to recross-examination. It must be clear that counsel cannot be permitted to prolong the course of trial by continually returning to matters already considered or as to which he has been given ample opportunity to examine; otherwise, there would be no orderly procedure, and nothing but confusion.

Defendant's next contention must be decided adversely to him. As has already been disclosed, aside from the testimony of Caputo, the balance of the evidence against the defendant was in its nature circumstantial. The testimony concerning the bloodstained clothing and money having been introduced, the Commonwealth called as an expert witness a police chemist who testified that he had made tests of the stains on the money and on the two pockets of defendant's trousers. The latter fit the description of the clothing which Caputo testified was worn by the killer. The chemist testified that the tests established the stains to be blood, but that he could not declare whether it was human or animal blood, nor whether it was the blood of decedent or of the defendant. The court refused defendant's motion that the chemist's testimony be stricken from the record and the jury instructed to disregard it on the basis that it was irrelevant. The stains were one of the links of circumstances connecting this defendant with the killing. The chemist adequately explained that the stains were of such small quantity that he could not go further than to declare that they were blood, but he also testified that as of the time of the tests (made five days after the crime) the stains were at least three days and not more than

seven days old. This was very pertinent testimony, particularly upon consideration of the fact that the money and the clothing were in the possession of the police within some twenty-four hours after the crime. It was a circumstance which could be considered by the jury, as much as clothing and other similar matters used to identify and connect individuals with a crime. It is not necessary to prove by expert testimony that alleged bloodstains were of human blood: *Gaines v. The Commonwealth*, 50 Pa. 319.

"Proof by eye witnesses or direct evidence of the corpus delicti or of identity or of the commission by the defendant of the crime charged is not necessary. '. . . It is clearly settled that a man may be convicted on circumstantial evidence alone, and a criminal intent may be inferred by the jury from facts and circumstances which are of such a nature as to prove defendant's guilt beyond a reasonable doubt.' ": *Commonwealth v. Bolish*, 381 Pa. 500, 508, 113 A. 2d 464. Here, we have not only such circumstances that a jury could reasonably infer defendant's connection with the crime, but also the testimony of the eyewitness identifying him as the killer. There is no doubt about the relevancy of the testimony.

In *Commonwealth v. Holden*, 390 Pa. 221, 134 A. 2d 868, defendant complained that the Commonwealth failed to produce bloodstained clothing worn by defendant at the time of his arrest, and that this constituted fundamental error. As pointed out in that case, the Commonwealth did not do so because the laboratory technician was out of the jurisdiction. There, at page 226, we declared: "This is not a case where the Commonwealth suppressed the evidence; on the contrary, the introduction of defendant's blood-stained clothing would have made out a stronger case against the defendant, and consequently its omission was harmless

error." In the instant case, the Commonwealth supplied the answer to just such contention as was made in the cited case, and with proper motive and right. The circumstances were consistent with the crime, and properly submitted to the jury's consideration.

The defendant's guilt was established beyond a reasonable doubt after a full and eminently fair trial, the charge of the court was full and completely without error, and therefore judgment and sentence are affirmed.